Page 23-1006 United Parcel Service, Inc. Petitioner v. Postal Regulatory Commission Ms. Sullivan for the Petitioner, Mr. Shi for the Respondent, Mr. Longstrap for the Intervenors. Good morning, Council. Ms. Sullivan, please proceed when you're ready. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for UPS. We are back before this Court again because the Postal Regulatory Commission has once again defied its obligation under 39 U.S.C. 3633A.3 to ensure that, quote, competitive products cover an appropriate share of the institutional costs of the Postal Service. This Court remanded in its April 2020 decision, because the PRC had failed in its prior order to consider institutional costs that are, again, I quote from 39 U.S.C. 3633B, uniquely or disproportionately associated with any competitive products. The remand goes back. We're three years and 250 pages later, and we're in the exact same position we were before. Why? Because the Postal Regulatory Commission said, okay, we had the remand, and we now find, again, that there are no, not a single dollar, no disproportionately associated costs. That is contrary to the statute, and it's contrary to the Court's prior order, and another remand is required. And I'd like to begin with why the new order is contrary to the statute's text. And for that, I really don't need to go beyond the Court's previous order in the April 2020 decision. Section 3633A.3, which incorporates the definition, the requirement of 3633B, that you look at disproportionately associated costs, that cannot be subsumed by a 3633A.2 analysis. So even if the PRC has done its cost attributable analysis under 3633A.2, this Court said the statute has two separate requirements. You have to look at the cost attributable, and then separately, because 3633A.3 is not subsumed, you have to look at the cost. So, on the statutory interpretation question, before getting into what exactly the Commission did, would you agree that it would be okay and number one, in theory, the A.3 costs could be broader, just requires an association and not causation? And then point two, we've really tried, but we just can't find a non-arbitrary way of measuring costs that fall within that difference. And so that's the reason we're not identifying costs in that bucket. Now, I suspect you certainly disagree that's what they did, but if it was what they had done, would that be okay? Yes, Your Honor. If that's what they had done, that would be okay. If there's separate legal requirements and the Postal Regulatory Commission had gone back in earnest, using the best economists in America that it has access to, and had done an actual effort to discern, identify, and quantify costs disproportionately associated, then they would have an escape hatch from the 2020 order. But that's not what they did. Can I just ask in our language and our prior opinion? Yes, Your Honor. So is that hypothetical scenario what was accounted for by our phraseology when we said, not only has the Commission not adequately explained why the statutory phrases at issue here have similar meanings, but nor has it demonstrated that these statutory categories, even if distinct in meaning, nevertheless coincide in application? That's exactly correct, and they haven't done that this time either. So even though you afforded them the opportunity to show that disparate meaning as a matter of theory, but practical convergence as a matter of fact, there is no such showing in this record. And I'd like to point to some key kind of smoking admissions in the order that prove my point, that this was not an empirical inquiry. It was an ipsodixit. If we look, for example, to page, the order statement at, well, let's start with their bottom line. The bottom line is at Joint Appendix page 1132. And I'll quote, the PRC says, there are no costs uniquely or disproportionately associated with competitive products other than those that are also classified as attributable. So that's the bottom line, 1132. And if you look to nothing else on 1132, look to the site to JA 500. This is a site to a prior order. And what's happening at JA 1132 is they say, there is only one economically sound, to go back, Judge Garcia, to your point. They say there's only one economically sound way to do cost allocation, and that's to rely on our A3633A2 methodology. That is reliably identified causal relationships. So what the ipsodixit on 1132 is, and let me read it to you because it's quite stunning. JA 500, which is referred to on 1132, says, the only economically sound method, the only economically sound method in the universe to, I'm sorry, I added that, to measure the association of costs with products is through activity-based costing, which is based on reliably identified causal relationships. There's ipsodixit number one. So that's a good example. Why can't that be read to say there is currently no economically sound method to measure that cost? And I would point out that when the commission discusses this issue, I might get the exact pages wrong, but it's around page 105. There are a lot of comments that come in and say UPS has a method, but that's arbitrary. And they're really going around this question, is there another method? Yes, your honor, we think it's contrary to statute and it would certainly be arbitrary and capricious to say there is no other method. Cost allocation is done all the time. You have the report of the prior utility regulators. Private companies allocate costs all the time. If you can't find a perfect method, you look for a pretty good method. And we cite numerous cases to the court, this court's president saying, if you don't find a perfect method, uncertainty is not enough. NET Coalition, American Hospital Association, Wisconsin versus EPA, your honor's prior test is, you have to show it's impossible. So Judge Garcia, even if they quibble with our tests and they think some other tests are not so great, they haven't come close to meeting the impossibility bar. And I want to make one more point about the ipsodixit, your honor, and this is a crucial other record site in answer to your question. If you look at Joint Appendix page 1170, this is an extremely important page. This is page, I believe, 100 of the order. This says joint costs, costs that are simultaneously incurred by the distribution of market dominant and competitive products. And this is the key language on JA 1170. It is their very nature that such a relationship does not exist. In other words, can there be a disproportionate association between a competitive product and joint costs, which are captured in the institutional bucket? And they say, no, as a matter of theory, it cannot exist. That's wrong. The whole point of 3633A3 is you have to look at that great big institutional bucket, which is almost half the cost of the Postal Service. This court approved in the 2018 decision, the cost attributable methodology. We're not quibbling with that here. That was an A2 case, but that methodology is so conservative. It looks to reliably identified causal relationships that it leaves this gigantic institutional cost buckets. And 33A3 says go into that and 3633B says go into it and look for disproportionately associated costs. Can I ask this question as a follow up? Go ahead, Judge Rogers. Please, Judge Rogers. Sorry, is that the chief judge? Please go. Ask your question, Judge Rogers. Thank you. Counsel, this is Judge Rogers. I'm on audio only because of an internet problem. In any event, what I'm not totally clear about is why should this court, following up on Judge Garcia's question, read what the commission has said in a way that, as I understand your response, does not indicate that it went back to square one and redid all of its empirical analysis, relying on studies, etc. Why is this court not required to look at the current order in light of the full record that was before the commission? Good morning, Judge Rogers. It's wonderful to hear your voice. And I would like to answer your question as follows. The order must be reasoned and reasonably explained. And saying you did a lot of studies is not enough. And saying that you have quibbles with the commenter's proposed methodologies is not enough. You have to show how you, the Postal Regulatory Commission, tried a regression and it didn't work. We tried another form of econometric analysis and it didn't work. I would challenge my friend on the other side, Mr. Shi, to show you a page anywhere in the record where the Postal Regulatory Commission names an econometric regression or other approach that it tried to allocate the cost in the institutional cost buckets either to competitive or market dominant. It simply did not do that. So, Judge Rogers, they can quibble with a lot of other studies, but the fact that you quibble with our studies goes only to how to perform a regression. Our legal point is that something, a regression or an analysis must be performed under 33A coupled with 3631B and they didn't do it. They do not name it. Can I ask a question about that? So, and earlier you used the word. Let me follow up. So, your view is that this court must interpret our previous opinion to require more than, quote, considering. You're saying, as I understand it, that our prior opinion required more than consideration in the sense of, yes, we looked at this, but actual empirical studies. Yes, Your Honor, that is our position. We think whatever the meaning of consider is in the statute and in this court's prior order, it cannot be satisfied by saying, well, we don't think those costs exist. If you don't think there are any costs associated disproportionately with competitive products, with packages, that defies common sense because of course you need bigger trucks to deliver packages. You need different scanners to scan packages. There's a host of costs we identified, which as a matter of common sense would seem to be disproportionately associated with competitive products. That means more associated than not. It doesn't have to be a reliably identified causal relationships. We've been there, done that in 2018. We're not arguing about the attribution methodology. We're saying that Congress told you to do two things and you only did the first, and then you said the second is subsumed in the first. So, there's nothing wrong conceptually with an approach under which the commission would say, yes, there's a conceptual distinction between these two, and yes, there may well be these costs, but to paraphrase your argument, you're wrong to say that there's an impossibility threshold because there's an economic soundness overlay. So, what we mean by impossible is it's impossible to divine those costs and assign them appropriately, not because they don't exist, but because there's no economically sound way to do it. That's right, Your Honor. And you'd be okay with that. Well, Your Honor, I'm into my rebuttal time. Okay, we'll make sure you have rebuttal time. Is it acceptable for me to answer that question? Yes. And there were a couple of more points I just wanted to leave you with. So, I'm asking for additional time, but you stop me whenever you want to. Sure. No, we'll make sure you have rebuttal time, so you're welcome to answer the question. Thank you very much, Your Honor. So, the answer to the first question is it's conceptually fine to say Congress told us to do two things, but we've really tried the second and it cannot be done. That's to meet the impossibility threshold. It is not met. It is not met on this record. Why? Because economic soundness, and I want to be, I think I wasn't that clear on the importance of Joint Appendix 1170. Let me try it again. The court, the PRC said anything that is economically sound, an economically sound analysis is coterminous with, synonymous with the A2 incremental cost test, reliably identified causal relationships. They say it's the same thing. In other words, they say there's no other method in the universe that could ever determine the allocation of costs between competitive and market-dominant products, other than the A2 test, which has now been, you know, amended to be the incremental cost. To me, the dispute then comes down to whether we agree with everything you just said, except that unless we read it to say no such method exists today, right now, and we really tried to figure it out. Yes, well, but Your Honor, I want to just qualify that a little bit. Congress doesn't enact statutory provisions idly. It put A3 in on top of A2 and A1, and yet the regulatory commission's purpose is, eh, never mind, they really didn't mean it. And if you're going to tell Congress it didn't mean that you have to perform a regulatory analysis that you shall perform under a mandatory provision of the statute, you better have a pretty darn good record of impossibility. And I defy the Postal Regulatory Commission before this court today to point to a single place where they said, we tried a test different from UPS's regression, and it didn't work. No economist in the universe would bless it. That, they didn't come close to meeting that. But Your Honor, I think what's telling is they fall back on other arguments, which I'll dispatch very quickly. One, they say, well, we have the greater power to eliminate all appropriate share, and that includes the lesser power to set the appropriate share at whatever level we want. That's easy for this court to reject. That's certainly not what Congress intended by saying they could eliminate the appropriate share. Maybe you could if there were no packages and you had no competitive products to allocate costs among. Maybe you could do that if the Postal Regulatory Commission got really good at attribution and attributed 100% of its costs. But the eliminate proviso is inapplicable where you're throwing 40% and soon 50% of your costs over into the unattributed institutional cost bucket. And then last, they say, Your Honor, and this one, I really think bears special mention because it's really so they say, well, market conditions are fine. We can trust the Postal Service to take care of this because it turns out right now, you know, the formula makes them allocate 10% or maybe 11% of the costs to competitive, the institutional costs to competitive products. But we look at what the Postal Service was doing in last year. They actually allocated 39.2% of institutional costs to competitive products. So that's fine. If men were angels, we wouldn't need government. And if regulated entities could be trusted to look after their own obligations through their own incentives, we wouldn't need regulatory bodies. So it's really quite surprising that you would say there's no need to apply the formula. So in some, let me close here. I'll try to be brief, but I want to go back to 2018 because it's very important here in this courtroom before the panel in 2018. The counsel for the Postal Regulatory Commission, Mr. Shee, represented to the court, this is at the oral argument audio at minute 39, said, please approve our A2 methodology for attributable costs, cost attributable. And don't worry that that's going to create a competitive deficit that's going to create an unlevel playing field and lead the Postal Service to underpriced package shipments. Don't worry about that because there's a rulemaking going on. There's the A3 rulemaking going on. And what Mr. Shee told the court on behalf of the commission at that time is the A3 rulemaking is going to make sure that unattributed costs that are disproportionately associated with competitive products will not just, and I quote, vanish into the ether. In other words, we're going to find a positive quantum of institutional costs that competitive products cause and therefore have to cover. The formula came back with the same formula, 10%, 11%, not 39.2%, not 50%. And that was an important representation to this court because, Your Honor, this court wrote in the 2020 opinion, this is at 890 Federal F3rd at 1067. This court has no reason to doubt that the requirement that competitive products cover a share of institutional costs will adequately ameliorate any competitive deficit left by the PRC's approach to cost attribution. We're here today because that promise was not met. No amelioration. There is a competitive deficit. It defies the purpose of the statute, which is to level the playing field, and therefore it's contrary to law. I have one last question just about the competitive conditions. You've said a few times there's a competitive deficit. And one way of thinking about prevailing market conditions and what the commission looked at here was, is there an indication in the market that the Postal Service is underpricing its product? So in that lens, the data, for example, that all three market participants have consistently raising prices above inflation, et cetera, et cetera, seems a compelling indication that it might be justified for the commission to do exactly what you described, which is, we're going to hang back until there's some indication of prices being too low. And my question is to you, what's the best indication in the record that USPS is actually underpricing its products? Well, Your Honor, first, we don't think that's the thing we have to prove. We have to show is that the Postal Regulatory Commission is failing to require that the Postal Service come and that the competitive products cover their cost. But I want to, we don't think we have to meet the test, right? Let me come back one step. Certainly if they were ignoring disproportionately associated costs. Yeah, yeah. I'm trying to ask separately, just about the provisions. Yeah. So 3633B says consider two things, competitive conditions and consider disproportionately associated costs. The answer to why the competitive market piece of 3633B doesn't excuse the failure to let competitive products not cover their costs through not finding any disproportionate association. The answer to that is one factual. It's undisputed that the Postal Service still has enormous financial losses. You can take judicial notice of last year's numbers, $6.9 million in financial losses. It's difficult to square the proposition that the market is functioning in a healthy manner with those financial losses. And the Postal Regulatory Commission says in the order that it doesn't have to consider financial losses, which is actually considering competitive market conditions, you would think financial losses would be relevant to that. JA1102, appropriate share as a discretionary pricing review, not a costing exercise. And again, JA1214-15, it says financial losses are irrelevant, irrelevant. Financial losses are irrelevant to appropriate share determination. So we think it's arbitrary and capricious to say you're looking at competitive market conditions, look at a couple of price increases, but ignore the losses. We think that a remand order should clarify that financial losses should be considered as part of the appropriate share analysis and that 3633B by its terms compels that by the reference to competitive conditions. But, Your Honor, the second answer is really, again, that's not through any work of the Postal Regulatory Commission. It's undisputed here that the Postal Service – remember, the Postal Regulatory Commission says competitive products have to cover maybe 9, 10, 11 percent. Maybe if this dynamic formula keeps really working, we'll get to 12 percent. But the Postal Service is already finding that competitive products cover 39.2 percent. So the Postal Regulatory Commission's formula is not helping out with these competitive conditions. And that comes back to my argument about trust. They're saying trust the Postal Service. It's going to be a profit maximizer. It's inconsistent with financial losses. But that's not – the Postal Regulatory Commission's job is to ensure, not to trust, but to ensure that the Postal Service will handle competitive products in a way that makes them cover their costs. And all that is in the service of a level playing field. It's rather astonishing that the commission says, well, Congress got rid of the break-even scheme. Yeah, the break-even scheme said they couldn't make a profit. But it didn't say they could make a loss. And if institutional costs are half the cost, and if competitive products are 40 percent by the Postal Service's own reckoning of that institutional cost bucket, and the formula says competitive products have to cover 9 to 11 percent of the loss, that is an arbitrary and capricious formula, even if it's not contrary to law. We've suggested various things that they could do that would not be arbitrary and capricious. You don't have to accept our proposal. We say start at 39.2 percent. Take the attributable cost share that represents competitive products, 43.5 percent. It's fine if you don't like the proposals, but we would ask at minimum that the court remand with the instruction that you can't have a null set for disproportionately associated costs. You can't come back five years and two rulemakings later and say, yeah, disproportionately associated costs, Congress wanted us to find them, but I'm sorry, we tried. We didn't try very hard, but we think it's by definition impossible. We didn't show that it's practically impossible. That's not good enough. They've got to find something more than a null losses, and they should follow last point is 3922B, very important adjacent provision of the statute that this court should interpret as part of the structure. These provisions all work together, and 3922B says you must allocate appropriately total institutional costs between competitive and market dominant products. That means 3922B and 3633A3 and 3631B are the mechanism by which you can do that. We've cited on page 41 of our brief a prior postal commission order that says it's the mechanism by which you do it. If you're not allocating costs between competitive and market dominant products, you're not satisfying 3922B, 3633A3, 3631B, contrary to law, arbitrary and capricious. It's a big thing to ask you to remand again, but we would respectfully ask that you again remand with guidance this time so that we don't, Judge Rogers, have another futile exercise in saying we looked at other studies we didn't like. The postal commission has to show there's a study it performed that satisfies the impossibility test. Thank you, Your Honor. Thank you, counsel. Mr. Shi, we'll hear from you now. May it please the court, Mike Shi for the commission. Petitioner has just made what I think is a fairly remarkable admission from the podium because petitioner has just conceded that bottom line of the commission's order is both lawful and consistent with this court's remand decision in 2020, just as long as the commission explained itself adequately. So I think the dispute now is relatively narrow, and it focuses on whether the commission has itself explained its reasoning. And you'll find if you have just even a cursory look at the pages that the other side cites that their assertions of Ipsy Dixit are just that, Ipsy Dixit. So on the so-called smoking gun page of J.A. 1170, they cite a sentence in the middle of the paragraph, but they ignore the, you know, sentence just two ones down that says detailed analysis supports the commission's conclusion that it cannot reasonably estimate which portion of unattributed inframarginal costs are more related to competitive products than market-dominant products as estimation implies even a minimal level of accuracy and would be arbitrary. And if you look at the commission's actual reasoning as opposed to the cherry-picked statements that just sum up the commission's conclusion, you'll see evidence of this very deep consideration. A very good example comes from the discussion of trucks. And so this is the other side's leading example of how the commission's methodology just gets it wrong, the commission failed to do consideration. Because UPS points to a photograph of a mail so that must mean that every dollar spent on these trucks or basically every dollar spent on these trucks, a big proportion of the dollar spent on these trucks, they must be uniquely or disproportionately related to competitive products. The commission erred by refusing to consider them. And as the commission pointed out, it's nowhere close to that simple. So the discussion begins on page 1260 of the joint appendix where the commission acknowledges that UPS is right in some sense. The mail trucks have got to be a little bit bigger if they want to carry a lot of packages. So that, of course, is uniquely and disproportionately associated with competitive products. But then the commission went on to say that's already captured by the existing cost attribution methodology and is indeed considered an attributable cost that mail products have to bear if they're competitive. And that's because as the commission went on to say, quote, the difference between the depreciation cost of a vehicle sized to deliver only market-dominant products compared to a fleet size to deliver both market-dominant and competitive products, that's the same page JA 1260, that is the very definition of what is a cost attributable. And so the thing that UPS says these trucks are sized to do, well, we're already taking that into account when determining what is a cost attributable to competitive products. So you don't disagree with the way that the inquiry was framed by the other side, right, which is that, yes, in theory, you could, both in theory and in fact, there's a difference between what's already been attributed and what could be attributed. The question becomes, is there a way to attribute what's left over that works? In theory, your honor, yes. And I want to be careful because I don't want to accept all of my friend's premises. What I will say is that in the 2020 decision, the court held that the commission is free on remand to, quote, explain why these two statutory phrases have the same practical reach despite the use of different language. That's a 1049 of the opinion. And so the commission quoted that language and then proceeded to do exactly that. And the commission said, well, let's take a look at every single one of these costs. Well, a big chunk of them we're going to say are cost attributable. And so those are by definition uniquely or disproportionately related to competitive products. And so it's, you know, those, however, we're not going to consider for purposes of setting the appropriate share of institutional costs because they're not institutional costs. By definition, they are instead cost attributable. And, you know, there is no such thing, I suppose, as Schrodinger's costs, a cost cannot be in two buckets at once. And so, you know, having said that, then the commission looked at all of these institutional costs that are left over. And the commission said, look, in 2020, the court held that in theory, some of these costs might be uniquely or disproportionately associated with competitive products. The commission accepts that. But the commission says, based on what we know now, and we have high confidence in our econometric tools, we don't think we can do that. And we don't think that there is any sort of way to establish a meaningful association, much less a meaningful, unique or disproportionate association between any cost in the institutional cost bucket, on the one hand, and a competitive product or all competitive products on the other. So I think that's the, what you just said is what UPS, at least as I understand it, is disagreeing with. Yes. And that they say, we should ask you, and so I'm going to, where in the appendix do you actually explain that you tried X or Y econometric method or this regression or that regression and found it not reliable to measure this difference between association and a causal relationship? So I have a couple of answers to that, Your Honor. And the first is I just want to correct a little bit of opposing counsel's question, because opposing counsel says, you know, the commission required some reliable methodology. That's not what the commission said. What the commission said was, you know, instead just quoting directly from this court's opinion, there still needs to be some meaningful association. And so the commission was not, in fact, conflating for purposes of figuring out what is unique or disproportionately associated, the reliably identified causal relationship test on the one hand, and what this court characterized as the requirement that, you know, there be, you know, a unique or disproportionate, you know, association demonstrated by some meaningful way. But, you know, having said that, I think the other thing I should point out at the outset is the other side thinks that some regression is required of the commission. That appears nowhere in the 2020 remand order. That appears nowhere in the statute. And that's, in fact, quite far removed from most principles of administrative law where, you know, one doesn't look at a statute and says, you know, the commission must perform economic analysis of this sort or that sort. And it's certainly not apparent on the face of the PAEA, which gives the commission vast discretion to consider these costs as the commission sees appropriate. And so I suppose the question is the NPRM and the final rule do repeatedly say no methodology exists. And then the next sentence sort of moves on. Right. And so if we wanted to look for the proof that no methodology exists, are you saying we should take the commission's word for it? Or is there something concrete in the analysis that we can look to? So there's a lot that's concrete. And so the analysis takes place at two levels. One is the commission's qualitative explanation for why its conclusion was correct in general with respect to the category of institutional costs generally. And the second is when the commission invited commenters to propose costs that they thought the commission's method, which, you know, was announced in the NPRM after remand, was wrong. So the commission recognized UPS, other commenters might disagree with the way we've thought about this question. So come tell us what costs you think are uniquely or disproportionately associated. We're going to consider them too. So to begin with the general answer, Your Honor, the commission's qualitative explanation for why there isn't such a relationship and why it makes sense for the commission to conclude what it did is because the costs in the institutional cost bucket are related to both the production of competitive products and production of market The tools we have available right now, we can't disaggregate, you know, how much is attributable to which and how much is attributable to the other. And so there is no meaningful way to say that any given institutional cost bears the requisite unique or disproportionate association to warrant consideration in this way. And so that's the justification that the commission gave and the examples that it cited. Basically, so the statements that say, once we have this bucket of unattributed inframarginal costs, we've studied them. And basically, by definition, they are equally associated with both lines of products. That's right, Your Honor. It's impossible to say right now that anything in that bucket is meaningfully uniquely or disproportionately associated with competitive products. And so that was the commission's top line conclusion. But then the commission said, we recognize that people disagree. UPS obviously disagrees. And so, you know, I would point the court to the discussion, basically beginning at JA 1259 to 63, where the commission talks about trucks. UPS says that a lot of truck costs are uniquely or disproportionately associated. And the commission rebutted that in detail. And the other side's response reply brief doesn't really have much of an answer to what the commission said, except to assert that, you know, UPS continues to disagree with the commission's analysis. The same goes with mail carriers, which the commission discussed at pages 1270 and 72 of the joint appendix. Here, too, UPS asserts that the commission is wrong because, look, there's a whole bunch of mail carriers and a lot more costs of mail carriers are uniquely or disproportionately associated with competitive products that the commission is willing to acknowledge. And the commission here, too, goes through and explains why that doesn't make sense. The commission said, you know, obviously, the cost of mail carriers is measured in terms of what they're spending their time on. And so, to the extent that they're spending their time walking packages up to mailboxes, then that's, of course, attributable to competitive products. But, you know, though it is uniquely or disproportionately associated, but the commission has already put those costs into the category of costs attributable, so they're not institutional costs at all. But then there's everything else. Can I ask one more specific question? So, I certainly understand this argument. When I was reading the NPRM on pages 510 to 11 of the joint appendix, there is a statement that seems in significant tension with that story and says, to the extent that future refinements and costing methodologies occur, should those refinements result in the economically sound observation of costs uniquely or disproportionately associated with competitive products, cost attribution would be updated to include those costs and would no longer be classified as institutional. So, that's a long sentence, but it sure seems to say that, in our view, by definition, any future methodology that would measure any association would be thrown into the bucket. And so, this third bucket of disproportionately associated costs is a null set. I know, I'm sorry to give you a pop quiz if you're not familiar with that, but does that question make sense? It does, Your Honor, and I am familiar with that statement. And I don't think it undermines the commission's analysis in two ways. And so, with your leave, let me try to explain why. The first is, is this court explained in 2020, and this, I think, is critical. There is no legal requirement that there be, as a practical matter, a cost that exists in the uniquely or disproportionately associated bucket that is not classified as an attributable cost. And we know that because on page 1049, the court said these two statutory phrases may have the same practical reach despite the use of different language. That's exactly the scenario that this court anticipated the commission might come down and conclude. And then, from a theoretical matter, you know, what your Honor is saying is, it just demonstrates how strong the commission's cost attribution methodology really is. Because, you know, as that sentence illustrates, the commission is updating that cost attribution methodology all of the time. It's improving its distribution keys. It is making refinements to the way that it measures what costs are attributable to competitive products in, you know, the sense that it's measuring what costs would go away if competitive products were to go away. And in doing that, the commission is saying, you know, these costs were once classified as institutional, where they would only be, the Postal Service would only be required to bear, quote, an appropriate share of them. But now we're going to require that they be classified as attributable, which means that to the extent that they're associated with competitive products generally or with a competitive product specifically, well, then the Postal Service has to cover that. And so their criticism of, you know, this criticism, for me, is a little hard to fathom because it just demonstrates that once the commission updates its reliably identified causal relationship methodology to figure out these costs and adds more costs to it, they don't disappear. But instead, they go from the category of institutional costs to the category of attributable costs where they must be accounted for by the Postal Service in, you know, the relevant census under Sections A1 and A2 of the statute. I'm sorry, Your Honor, I got pretty caught up in this. I noticed that my time has long since expired. I want to make sure you have a chance to address the delta. I think I know what your answer is going to be, but I want to hear the delta between the 39 percent and the 10 plus percent. Yeah. So my first answer is statutory, and my second answer will be practical. So as a statutory matter, there is no requirement that the appropriate share be set at current cost coverage levels. That is not at all apparent from the text of A3 or the text of Section 3633B. To the contrary, Congress characterized the appropriate share as, quote, a minimum contribution requirement, not a requirement that there be 100 percent cost in product. So that's the theoretical answer. And as a practical answer, as the Commission explained, the fact that the Postal Service is currently able to reach 40 percent cost coverage just testifies to the strength of the market, the underlying power that the Postal Service has to set prices, you know, at such a level as to capture 40 percent of institutional costs or something along those lines. But I think Intervenor's brief makes a good point when, you know, they explain, and the Commission explains this as well, that current market conditions may not stay the way they are. And so what UPS is proposing in some of its suggestions is that this court require the Commission to set the appropriate share at what the current level is. And, you know, that would basically freeze the appropriate share at the current snapshot in time and, you know, essentially subject the Postal Service to a price floor that may be, in fact, too high if market conditions shift, as Intervenor's brief makes clear that they have begun to. I think Intervenor's brief points out that now the volume of competitive products has actually decreased. And so there's no reason to believe that current market conditions are going to persist. But that also relates to another issue that my friend on the other side has brought up, which is findings about the fundamental health of the market. You asked Judge Garcia, the other side, to point to the best evidence against the Commission's very detailed description of how it assesses the health of the market. And the best evidence that the other side was able to point to was the fact that the Postal Service has lost money. And they say that this is the gun. A private enterprise wouldn't be able to sustain losses like this. But the Commission addressed that at length. And so although the other side characterizes what the Commission said as ipsy-dixit, if you look at what the Commission actually said on pages 1214 and 1215 of the JA, the Commission found that these losses are not driven by underpriced competitive products, but instead by sharp decreases in the volume of market-dominant products and also by the Postal Service's until-recent obligation to pre-fund certain retiree health benefits. And, you know, the Commission also found that were it not for the fact that the Postal Service was trying to extract value from its competitive products, the losses might even be more significant. Is there anywhere in the appendix we can look to find out if the Commission thinks I can look into that and find out, Your Honor, if you need. Okay. But, you know, the critical point here is that, you know, at the end of the day, the Commission has made an expert judgment about the health of the market. And the Commission has found that, Your Honor, I'm sorry. Let me revise the answer to your question, because I think I can get at kind of what you're asking. What you're asking is whether there is evidence of deliberate underpricing by the Postal Service of competitive products, I think. And what the Commission found with respect to that is that there has been no evidence of the Postal Service engaging in that kind of underpricing. And to the contrary, the Postal Service has always exceeded the costs that it was required to cover. And the 1219 and footnote 156 of the joint appendix where the Commission discusses the evidence of underpricing and the lack of evidence of deliberate misbehavior by UPS. Let me make sure my colleagues don't have additional questions for you, Mr. Sheik. All right. Thank you. I'd like to hear your response to Petitioner's argument that neither the Commission nor the court can ignore the plain statutory language, where Congress made a decision that it wanted the Commission to look at separate things and advise after essentially an empirical study that what Congress was requesting was either not possible or made no economic sense in the way the Commission understood what was happening in the market. Thank you, Your Honor. I have two responses to that. Again, the first is legal, and the second is on the face of this record. So as a legal matter, there is no impossibility threshold in the statute or in the 2020 decision that led to the remand that we're discussing today. And this is important because the other side attempts to characterize Section 3633A and 3633B as somehow demanding that the Commission disprove the existence of additional uniquely or disproportionately associated costs beyond those that the Commission has already determined are also subsumed within the category of costs attributable. Nothing in the statute says that, and nothing in this court's decision says that. And so the other side is essentially attempting to invent an evidentiary requirement for the Commission that doesn't actually exist. But the Commission discussed that in detail, as I said in some of my colloquy with Judge Garcia, where the Commission explained as a qualitative matter that, of course, recognizing the legal distinction between the sweep of definitionally narrower than the legal sweep of uniquely or disproportionately associated, nevertheless, right now, on the basis of the econometric tools available to the Commission, there is no way to ascertain whether any cost in the institutional cost bucket bears the requisite meaningful, unique, or disproportionately associated relationship with competitive products to warrant consideration in this way. And I want to, you know, I promised points. I understand, counsel, I understood your earlier response. But what I'm focusing on is a congressional requirement that this court remanded the Commission to consider. And arguably, one might have thought the Commission would have responded somewhat differently, other than saying in a conclusory way, we considered these factors. And here's our conclusion. I mean, in response to Judge Garcia's question, I understood you to say you might be able to provide us with record sites, but not that it's clear on this order, what the Commission actually did. I'm not suggesting you have to meet an impossibility standard. But as I understand part of the argument, the problem with the current order, in part, is it's a trust the Commission analysis. And that's not good enough in light of Congress's specific requirements. So, I apologize for giving you that impression, Your Honor. I want to be absolutely clear. I emphatically reject the other side's characterization of the Commission's order as somehow based on a trust me because we're the Commission type analysis. And I emphatically reject the idea that the Commission's record that it developed fails to contain the requisite evidence of consideration. And so, for example, the qualitative discussion that I was talking about with Judge Garcia appears at pages 1149 through 1152 of the Commission's order, where it discusses its understanding of institutional costs. The Commission's discussion of institutional costs is also scattered at various points throughout where it responds to arguments about institutional costs. And so, you know, I would direct the Court to our brief where we discuss some of those other places where the Commission discussed institutional costs in general at length, and in particular, the portions of our brief discussing those aspects of the Commission's order showing that UPS's assertion through regressions of some relationship between institutional costs on the one hand and competitive products on the other simply just didn't hold up on any sort of, you know, the Commission's economic judgment. But in addition to that, I would direct the Court to the specific pages of the Commission's order where the Commission discussed all of the costs that UPS was invited to bring up in response to the Commission's analysis, because the Commission said, you know, we've looked at all of these costs. The way we've looked at them is we've, you know, figured out what they actually, you know, are after, you know, and these are the costs that can't be said to bear a causal relationship to the production of competitive products. And after thinking about it, we have concluded that it is impossible right now to demonstrate the existence of such a relationship, and that warrants significant consideration. But then the Commission said, we understand that the, you know, commenters and potentially even a Court might have concerns about this level of understanding. So just to make clear in our mind that, you know, we have got it right, we're going to ask for evidence of costs that are allegedly institutional costs that do bear the requisite unique or disproportionate relationship, but are not already captured by the definition of costs attributable. And so UPS was invited to submit many of these costs. UPS listed a whole bunch of them in their briefs, focusing on peak season costs, for example, the cost of trucks, the cost of mail carriers, the cost of capital investments, the cost of rural carriers, vehicle service costs, institutional costs of that sort. And there are pages and pages and pages of the Commission's order discussing all of those specific costs, explaining why UPS's assertion that those are, in fact, unique or disproportionately associated in a manner beyond what the Commission's analysis admits was wrong, and then saying that regardless of whether UPS was right or not, the Commission would consider those costs as if they were uniquely or disproportionately associated and reach the same conclusion anyway. Because at bottom, the Section 3633A3 analysis, as informed by Section B, does not mandate that the Commission reach any given conclusion once it has determined what these uniquely or disproportionately associated costs are. Instead, it leaves to the discretion of the Commission the decision where to set the appropriate share based on an assessment of, quote, all relevant circumstances of which the are one, of which the degree to which there is any uniquely or disproportionately associated costs are another. And the Commission faithfully discharged its responsibilities both under this Court's remand decision in 2020 and under the statute of Section 3633. So one provision that came up in the other side's argument, you haven't mentioned yet, is B9. If you just look at the text of B9 in isolation, it, we can certainly understand the submission that's being made. Yeah, so, absolutely. So UPS is dramatically overreading what that provision is. It's not in the competitive product section of the PAEA at all. It appears as one of nine unweighted objectives and 14 unweighted factors that the Commission was required by Congress to one governing market-dominant products, as this Court described in the NPPC case that we saw in our briefs. And as the NPPC case makes clear, those nine objectives and 14 factors often point in different directions, and weighing them necessarily involves tradeoffs that, you know, this Court said in NPPC the Commission is best suited to make. So if this B9 section isn't mandatory even in the context of market-dominant rate system developments, it's really hard to see how it eliminates the Commission's statutorily granted discretion in 3633B to modify or even eliminate the appropriate share requirement. And, you know, furthermore, accepting the other side's interpretation of B9 would render section 3633B superfluous, right? Because in their view, B9 commands that, you know, all costs of the Postal Service be allocated either to market-dominant or to competitive products. But if that were true, it would be really odd for then Congress to grant the Commission the discretion to set an appropriate share of institutional costs for competitive products, considering all of these things that we've been discussing during the rest of my time here. And it's also refuted, as the Commission makes clear at 1112 of the JA, by the legislative history of the PAEA, which shows that Congress considered but then ultimately rejected the idea of requiring competitive products to cover their share of institutional costs. And, you know, to the contrary, in section, in the legislative report that we cite on JA 1111, Congress said, you know, we don't want the Commission to attribute 100% of its costs, or, you know, we don't intend that the Postal Service be required to attribute such a large percentage to competitive products, that competitive products will cease to be affordable. That just demonstrates, going back to the statutory provision that actually governs the appropriate share, that what the appropriate share does is it's not a costing exercise. It does not mandate, even if you buy every single one of UPS's arguments with respect to unique or disproportionately associated costs, it doesn't mandate that the Commission do anything in particular with those costs when setting the appropriate share. To the contrary, as this Court made clear in 2020, the Commission retains the discretion to decide after making the appropriate consideration where the appropriate share should be. I'm sure my colleagues don't have additional questions for you at this time. Thank you, Mr. Sheehy. Thank you. Well, I want to follow up on one thing, then. Your position, as I understand it, is that UPS's interpretation of the word consider in the statute is nowhere supported by the text or, for that matter, the legislative history, that it had to do additional empirical studies. Back to your Honor. And it's not just the position of the Commission. As this Court described in the 2020 remand order, quote, it is not for this Court to say that the Commission must account for costs in any specific way under Section 3633B or that the Commission must make it… My question is focusing on something else, and I was hoping you could respond to that. So, you know, the Commission has discussed the meaning of the word consider. And what the Commission said in its order is that word consider does not mean to, you know, do anything in particular with. It means basically plain meaning of consider to think very hard about. And, you know, we describe the Commission's plain meaning analysis of the word consider in the brief. The other side doesn't really attempt to rebut the Commission's understanding of the word consider. And the Court's decision in 2020 is entirely consistent with the Commission's understanding of the word consider because the Court rejected UPS's invitation at that time to mandate that the Commission do something in particular on the basis of what UPS claimed the unique or disproportionately associated costs of the Postal Service were. The fact that this Court left to the Commission the discretion to reach the exact same conclusion on remand just underscores that the word consider doesn't have, you know, the overlay that the other side would like to attribute to it. And, moreover, the word consider doesn't have an implicit mandate that the Commission conduct a regression of any particular kind. It doesn't mandate that the Commission undertake a study of any particular kind. And, you know, to the contrary, governing principles of APA law make clear that statutes like this leave ample discretion to the Commission to decide how best to do consideration, you know, such as, for example, the Supreme Court's recent decision in the Prometheus case, which I think we cite in our brief. And so there is no minimum quantum of empirical data that this statute mandates or that the 2020 decision mandates. But, nevertheless, the Commission engaged with all of the empirical analysis presented to it by commenters, including UPS, and then proceeded to explain why that empirical analysis, which was inconsistent with the Commission's qualitative description of institutional costs, nevertheless made sense in light of currently available econometric principles. And so that's why what the Commission did is fully consistent both with the statute and with this Court's decision and with, you know, generally accepted understandings of what the word consider entails. Thank you. Thank you. Thank you, Counsel. Thank you. We'll hear from Intervenors Counsel now. Mr. Longstreet. Thank you, Honors, John Longstreet for the Intervenors. And I'll just try to be really quick because a lot of it's been hashed over already. We represent the users of the Postal Service. We have no interest in an uncompetitive marketplace. We want a competitive marketplace. We think there is a competitive marketplace. We have no interest in an on-level playing field. Our concern is that UPS does want to tilt the playing field. There's an old saying distributed to Senator Magnuson, all anybody ever wants from the government is a slight competitive advantage in their favor. And we, you know, UPS has been very assiduous about seeking that for decades now. Lawyers, economists, you know, we have good economists too. And the Commission went with those economists. Professor Panzer, there are two of his declarations that go into all of these issues in great detail. The Commission went with him. The Commission's entitled to do that. But the point is we use UPS as well. You know, we do not have an interest in an uncompetitive marketplace. We think the marketplace is competitive and there's no need for intervention here. I'd like to just address one point that my friend made, which is essentially the trust us argument. Well, we might as well not have government at all if we just trust regulated parties to voluntarily comply. You know, I'm, you know, I'll put my level of government up with anybody else's. I understand we have a position, I understand we have a place for government where the competitive marketplace isn't working. This is not a case where the Postal Service is making voluntary contributions to some kind of institutional cost fund, like some kind of charitable donation. They're operating in a competitive marketplace and their pricing behavior in the competitive marketplace where they're not price takers. You know, they don't have market power in that. They go and operate in that competitive marketplace. And the result of that competitive marketplace is, as UPS concedes, a 39.2 percent contribution to institutional costs in 2021. So that's not something the Postal Service is doing out of the goodness of their hearts. That's something they're doing as an economic actor in a competitive marketplace. And UPS has shown no need whatsoever for the Commission to have the kind of heavy-handed regulatory intervention into that marketplace that they seek. So it's not a question of trust us, it's a question of trust the market, as the Commission found. At this particular point in time, we can trust the market. The market is performing very well. There's also a thought that, well, you know, since all their remedies are doing is mimicking the market now, it won't really cause very much harm. We think it could cause significant harm, and I think the Commission's counsel talked about that, where you're sort of freezing in. You know, 2021, you know, it was after the pandemic, you know, it was kind of an upswing. What UPS would like to do would be to freeze that snapshot in time and then hold us to that, regardless of what the market does going in the future. That could really create a problem. If you start sliding down, you create this doom loop. We kind of describe it in our briefs, where, you know, if the Postal Service starts falling behind, then under these kind of fully distributed costing mechanisms, UPS wants they have to start making it up by raising their prices, but they're in a competitive marketplace, they can't do that, and it just kind of spirals out of control. That's the thing that we as users of the Postal Service would be very concerned about, that they would be putting them in that kind of situation. It hasn't come up today, and I'm just curious if you have an explanation. Okay. Is the Postal Service's market share in a little over 10 years has doubled from 9% to 20%? Yeah. Might be an indication that something is amiss, and I'm just wondering what the intervener's explanation of that dramatic rise is. Yeah, I mean, you know, they put a lot of effort into the competitive products business. They have a very, I mean, my client Amazon has a contract with them that's been a good contract for them and that has helped them grow their share. It's been good for us. It's been good for the Postal Service. So, I'm not sure I can really say what's going on, except that as the Commission found, and I don't think there's a shred of the fact that there's some kind of, you know, improper pricing going on by the Postal Service, you know, that's going fine. So, I'm pretty kind of, you might accept that just they're doing a good job with it, and we as Amazon think that they're doing a good job with it. That's why we've extended our contract. I think, I guess, yeah, I think I can sit down. Thanks. Don't have to. Thank you, counsel. Ms. Sullivan, we have the three minutes for rebuttal that you asked for. Thank you, your honors. Three quick points. Judges Garcia and Rogers both asked counsel on the other side to show where was the analysis that showed that, as the red brief says at page 19, currently available econometric techniques confirm that no institutional cost can be said to bear the unique or disproportionate relationship. Mr. She gave you no answer, which leaves us with the conclusion it is conclusory. Mr. She referred to page JA 1170, but there the Commission refers to detailed analysis. Yes, they use that word, but then it refers back to JA pages 1150 to 65, and I challenge the court to read those pages and find any analysis there. There is no analysis of a with the reference to the NPRM, JA page 510. That's because it's not that the PRC looked for these costs, cost relationships, and found they couldn't find them. It's that they've ruled out disproportionately associated costs by definition, because they've said the only methodology that is economically sound is reliably identified causal relationships. We make that point on page 41 of the blue brief. Second point, Your Honor, again, very quickly, Judge Garcia, you asked, is there any evidence that there's underpricing of competitive products? Mr. She says, look at JA 1214 to 15, and no, no, we lose money because of the decline in market dominant products and our pension obligations, but that's false. There is evidence in the record that competitive products are part of the loss problem, and for that, I would refer you to the blue brief at page 51, which cites to the Postal Service's own 10Q, which says losses were due in part to the competitive products business. Just because you lose money on declining market dominant products and pension obligations doesn't mean you aren't also losing money on competitive products. The failure to consider losses from competitive products was contrary to law. And third, Your Honors, on 3622B9, which Judge Srinivasan, you brought up at the end, Mr. She says, oh, well, that's not of the analysis because it's 3622A2, it's part of the A2 analysis, it's not part of the A3 analysis. But the Postal Commission itself has said otherwise. I cited you earlier, the easiest place to find this is Blue Brief 41. Blue Brief 41 is where the Postal Regulatory Commission says, even though B9 is outside of 3633A, it is the mechanism, A3 and B are the mechanism by which the Postal Regulatory Commission satisfies its obligation under B9, and the fact that it's one factor in nine doesn't mean that you don't have to consider it. It's one factor of nine, but you have to consider it. By definition, they fail to consider it. The order is contrary to law, arbitrary and capricious, and should be remanded. Thank you, Your Honors. Thank you, Tansel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Garcia, Rogers